**DISTRICT COURT OF THE VIRGIN ISLANDS**

**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | 3:25-cr-00050-RAM-EAH |
| **MARLENIS PENA PENA,** | |
| Defendant. | |

**TO:**   Natasha Baker, Esq., AUSA
Matthew A. Campbell, Esq., FPD
Tiana Marie Brown, Esq., AFPD

**MEMORANDUM OPINION**

**THIS MATTER** came before the Court on a bench trial held on February 25, 2026. Defendant Marlenis Pena Pena was represented by Attorney Matthew A. Campbell, FPD, and the Government was represented by Assistant United States Attorney Natasha Baker. The Government charged Ms. Pena Pena by Information with Illegal Entry by an Alien, in violation of 8 U.S.C. § 1325(a)(1). *See* Dkt. No. 11. At the conclusion of the bench trial, and after denying the Defendant's Motions for Judgment of Acquittal, the Court took the matter under advisement. For the reasons that follow, the Court finds that the Government has met its burden of proving Ms. Pena Pena's guilt beyond a reasonable doubt and finds Ms. Pena Pena **GUILTY** on Count One of the Information, Illegal Entry by an Alien.

**BACKGROUND**

**I.   Trial Testimony**

Prior to trial, Ms. Pena Pena filed a Waiver of Appearance at Trial and Sentencing, pursuant to Fed. R. Crim. P. 43(b)(2). Dkt. No. 42. In addition, the parties filed a Joint Discovery Statement containing a Stipulation to the admission of twelve of the Government's

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 2

Exhibits (1-10, 14, 22).[1] Dkt. No. 46, 46-2.

At trial, the parties did not offer opening arguments. The Government presented four witnesses. It first called Brandon Martin, a Marine Interdiction Agent with the Air & Marine Operations section of U.S. Customs & Border Protection ("CBP"). Agent Martin is stationed at the St. Thomas Marine Unit; he investigates, inter alia, drug and migrant smuggling. He testified that he was familiar with common smuggling areas in the Virgin Islands, including the Annaberg Plantation area located on the north coast of St. John, which was a short distance from the British Virgin Islands. The area contains a beach.

On May 8, 2025, his unit received a tip about a possible landing near Annaberg. Agent Martin, along with Marine Interdiction Agents Cody Napper and Craig Hayes, launched a vessel and arrived at Annaberg by 9:00 p.m. Agents Martin and Napper got out of the boat and went to investigate. The night was dark, and the area was unlit. They walked along a road near the beach wearing night vision goggles. Agent Martin heard voices up ahead and saw two individuals, a man and a woman, walking down the road. The two people started running toward an area where there was an embankment. Agent Martin yelled "Police! Policia!" and gave chase. The man and women fell down the embankment; the man was able to slip out of Agent Martin's grasp and continued through a swamp. Agent Napper was able to apprehend the woman. Once they returned to the roadway, Agent Napper conducted a search of the area and spotted another woman hiding in the bushes. His body cam footage,

---

[1] All Exhibits referred to in this Memorandum Opinion have been admitted.

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 3

Ex. 1, captured what occurred.[2] Agent Napper gave commands for her to come out of the bush. She did not resist and was handcuffed and searched. Agents Martin and Napper walked back to the vessel with the two women. After leaving them there, they went back to search for the man who escaped; being unable to find him, they returned to the boat.

During cross-examination, Attorney Campbell elicited from Agent Martin that Annaberg was a frequent smuggling location, that some aliens were unwilling victims of smugglers—required to do forced labor or sex work—and could be threatened with harm. Agent Martin agreed that alien smugglers can be dangerous, and if other people were around, or if the man who escaped came behind them in the dark, that could pose a danger to him and his partner.

In his testimony, Agent Cody Napper reiterated many of the same facts testified to by Agent Martin. He specified that the notification about a possible landing on the beach at Annaberg came from Border Patrol intelligence. When their vessel arrived at Annaberg around 9:00 pm, no other vessel was in sight. He and Agent Martin walked up the road parallel to the waterfront because an intersection farther up the road was known to be a place where people who landed on the beach would often wait for vehicles to pick them up. The two individuals on the road ahead of the Agents spotted them. He yelled Police! Stop! Don't Move! in English and Spanish. At that point, the Agents turned their flashlights on. The two individuals ran off the road and down an embankment that ended in a swamp. Agent

---

[2] The first two minutes of the footage had no sound. At the point Ms. Pena Pena came out of the bushes, Agent Napper realized he had not enabled the sound at the beginning of the recording and switched it on.

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 4

Martin tried to grab the male. The woman got tangled in the brush and the Agents apprehended her and brought her up to the road. Agent Napper scanned the area and spotted a second female suspect off the road, trying to conceal herself behind a bush; she was face down in the leaves. He ordered her to come out, first in English then in Spanish. Responding to the Spanish command, she grabbed her belongings and slowly came out. He placed her in handcuffs. Her face was covered with dirt and her clothes were dirty. The Government played the video of the apprehension and the return to the boat, Ex. 1.

Agent Napper asked the woman—who he later learned was Ms. Pena Pena—in Spanish what her nationality was, but she refused to answer. He asked that question because if a person was a United States citizen and had documentation, the investigation would go in a different direction (there would be no need to handcuff her, take her to the boat. and process her elsewhere). He also asked in Spanish if she had any weapons, but she said she did not understand and "continued to be difficult with us." He escorted Ms. Pena Pena to the boat, while Agent Martin escorted the other woman. Once they reached the boat, Agent Napper asked Ms. Pena Pena if she was Dominican, and she said she was. She did not claim she was a United States citizen or provide any documentation of United States citizenship.

On cross-examination, Attorney Campbell elicited similar responses from Agent Napper that smuggling could be dangerous and the two Agents were concerned about potential danger since the man who escaped could be armed and there could be a threat of physical violence.

Agent Craig Hayes testified that he was the vessel commander that evening,

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 5

responsible for the mission. He gathered a group—Agents Martin and Napper—and piloted the boat from Sapphire in St. Thomas to Annaberg. He stated that Annaberg was a hotbed for immigration, given its close proximity to the south side of Tortola (about 1½ miles away, where a boat ride could take less than ten minutes). There have been a number of immigration cases related to the Annaberg area. He dropped Agents Martin and Napper on the beachhead and stayed with the boat. Approximately 25 minutes later, the Agents returned with the two women. He quickly searched the women to ensure that they had no means of escape or weapons on them, put life jackets on them, and had them sit at the back of the vessel.

Agent Hayes attempted to speak to the women. One was non-responsive; the other, Ms. Pena Pena, was cooperative. In response to his request for identification, Ms. Pena Pena offered her purse. Agent Hayes retrieved her passport and sent the information to the Caribbean Air & Marine Operations Center. He also took a photograph of the passport, Ex. 4 (redacted), that indicated "Dominican Republic" as her nationality. She confirmed that was her passport. In response to Agent Hayes's question how she got to Annaberg, Ms. Pena Pena asserted that she came on a boat from Tortola that day. He had no further interaction with her. After Agents Martin and Napper returned to the boat, he piloted it to St. Thomas, where Ms. Pena Pena was turned over to Homeland Security Investigations ("HSI"). On cross-examination, Agent Hayes acknowledged that nothing was illegal if a person had a passport from the Dominican Republic, and nothing was illegal if a person did not carry proof of U.S. citizenship. On re-cross, the Government asked whether Ms. Pena Pena indicated whether

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 6

she legally entered St. John or the United States that night, and Agent Hayes responded in the negative.

The Government's final witness was Keridon Williams, the HSI Resident Agent in Charge in St. Thomas and St. John. He supervises all criminal and administrative investigations there and handles cases on occasion. He recalled that on May 8, 2025, he received notification that CBP Air & Marine operations were responding to a possible migrant landing in the Annaberg region on St. John. He headed into the office and two individuals were later brought there for administrative processing. He obtained Ms. Pena Pena's passport and, using her name, ran systems checks to see if she had lawful status in the United States. He took biometrics (fingerprints) and took her photograph, and ran the fingerprints through the FBI's system to see if she had a prior FBI number, if she had been arrested and charged previously, and through the IDENT immigration system that indicates if a person had had prior encounters with immigration officials and if she had any valid document such as a non-immigrant or immigrant visa, to determine if she could validly be in the United States and to insure that she was not a U.S. citizen.

The data checks revealed that Ms. Pena Pena had no status in the United States— there was no indication of entry, no (border) crossing data. There was an entry showing a previous voluntary departure at Cyril King Airport on St. Thomas in September 2015, where she was permitted to voluntarily return to the Dominican Republic. Agent Williams testified that he inspected Ms. Pena Pena's passport and determined it was issued on October 18, 2024 and showed Ms. Pena Pena's nationality as Dominican. He reviewed the passport pages

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 7

and found a Dominican Republic immigration exit stamp dated May 8, 2025 with the word "Tortola" written on it. (Ex. 5). He said the stamp represented that a Dominican Republic immigration officer affixed the stamp when Ms. Pena Pena flew out of the Dominican Republic and indicated she was going to Tortola. There were no other stamps in the passport.

Asked what the process was if a person presented themselves at a U.S. customs port of entry with only a Dominican Republic passport, Agent Williams responded that the person would be refused entry and returned to their country of origin; they needed to physically have a non-immigrant visa that they had applied for, or an immigrant visa packet that they applied for at a U.S. Embassy overseas, or have a lawful permanent resident card on their person. A visa would be physically affixed to a page in the passport. If a person is admitted at a customs checkpoint, the passport is stamped, indicating lawful entry, their classification of admission is indicated, and a crossing entry would be indicated in the system. The systems check on Ms. Pena Pena revealed no history of any lawful entry into the United States.

Agent Williams testified that he obtained from Ms. Pena Pena a Dominican Republic identification card (called a "Cedula"), Ex. 3, and a COVID 19 vaccination card showing that she received two COVID shots on St. John on February 2, 2022 and March 9, 2022, Ex. 14. The Cedula indicated Ms. Pena Pena's Dominican Republic nationality. An inventory search of her property, set out in a receipt, Ex. 9 that Ms. Pena Pena signed, showed, inter alia, that she had $1,280 in United States currency on her person and 2,000 Dominican pesos. Ms. Pena Pena's address on that document indicated St. John. She stated to Agent Williams that she lived on St. John and her children lived there as well.

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 8

      Agent Williams proceeded to ask Ms. Pena Pena biographical information that he included in the DHS Personal History Report, Ex. 8. The form sought, inter alia, the person's name, address, citizenship, place of birth, passport information, physical characteristics, and names of parents and children. Agent Williams explained that the information was initially obtained from Ms. Pena Pena prior to conducting an interview of her. He used Google and his elementary Spanish to ask her questions so Task Force Officer Stephanie Gabriel, who was present, could fill out the form. Ms. Pena Pena provided two addresses: one on St. John and another in the Dominican Republic. After the form was completed, Agent Williams contacted a translator on the telephone who verified the biographic data, reviewing every line on the Personal History Form with Ms. Pena Pena in Spanish to insure the information was correct. Ms. Pena Pena responded "Dominican Republic" to the questions asking about her citizenship and place of birth. She stated that her parents were not U.S. citizens or lawful permanent residents. Her three children were born in the Dominican Republic, and currently live in St. John. The interview was memorialized in a written ROI (Report of Investigation) that was not entered into evidence, and an audio/video recording, Ex. 7. The Government played the recording that showed the verification of the information on the Personal History Report through the translator.

      After completing the Personal History Report, Agent Williams gave Ms. Pena Pena a statement of her Miranda rights written in Spanish that he read in English while the translator translated the text in Spanish. Agent Williams testified that Ms. Pena Pena indicated that she did not want to sign the form and answer the questions and stated that

she wanted to be sent back to the Dominican Republic. The video showed Ms. Pena Pena responding, "I want to be sent back to my country." "I just want to be sent back to Santo Domingo." At that point, Agent Williams terminated the interview and did not inquire further about Ms. Pena Pena's entry into the United States.

The Government then asked Agent Williams to name the ports of entry on St. John and St. Thomas. Agent Williams responded that, on St. John, the port of entry was in Cruz Bay Terminal, while on St. Thomas the ports of entry were Cyril King Airport, the Blyden Ferry Terminal, and a private clearance area Yacht Haven Grande for private vessels. Generally, the port of entry on St. John, run by CBP, was open from 8 am. to 5:00 p.m. Agent Williams stated there were no entries in the systems check showing any entry into the United States in 2015 or 2022 or 2025 for Ms. Pena Pena.

On cross-examination, Agent Williams explained that the systems checks accessed five or six different databases, and the biometrics check accessed an FBI database; they all were linked to her name and helped to determine whether an individual had an adverse action with immigration or an FBI record and if the person had a valid visa, a claim to citizenship, a green card, and a crossing history. Attorney Campbell questioned Agent Williams regarding a report he had written about his interaction with Ms. Pena Pena (apparently the ROI not entered into evidence). Attorney Campbell pointed out a number of facts that Agent Williams had testified to that had not been included in his report, such as: he did not document that he took Ms. Pena Pena's fingerprints, he did not indicate that he checked two different systems for a total of seven databases, and that the databases showed

that she had not applied for a visa and was not a naturalized citizen. The only information he included in his report about records checks was that Ms. Pena Pena was granted voluntary return in September 2015. Agent Williams explained his report was a summary and did not include everything and denied that what he testified to was significantly different from his report.

Attorney Campbell also elicited that Agent Gabriel had written the answers in the Personal History Report before the Agents called the translator. Agent Williams's ROI did not include that Ms. Pena Pena lived on St. John. In addition, during the videotaped portion of the background information interview, Agent Williams did not ask Ms. Pena Pena about her race, height, eye color, hair color, or weight, which were questions on the Personal History Form. Attorney Campbell then pointed out that not all the information on that form was confirmed through the translator. Agent Williams explained that he responded to those questions without the translator because he could observe those facts with his own eyes. He agreed that not everything on the form was confirmed by translator. In response to Attorney Campbell's questions, he also acknowledged that nothing was illegal if a person had a Dominican passport or dual citizenship. On re-direct, Agent Williams stated that, as the case agent, he attended a detention hearing in which Ms. Pena Pena gave an address on St. John where she would reside.

After Agent Williams finished his testimony, the Government rested its case.

## II.     Motion for Judgment of Acquittal

Attorney Campbell then moved for a Judgment of Acquittal pursuant to Fed. R. Crim.

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 11

P. 29. He asserted that the Government failed to meet each element of a § 1325(a) offense beyond a reasonable doubt. The Government did not establish the circumstances of how, where, or when Ms. Pena Pena entered the United States and if she voluntarily entered, but only the fact that she was on St. John. The assumption was that she entered on Annaberg beach, but it was not known if she entered at Cruz Bay (the port of entry on St. John) and the agents there told her to come back the next day. She was not asked if she was brought against her will to the United States.

Attorney Baker opposed the motion, countering that the Government had proven each element of the § 1325 offense beyond a reasonable doubt. The first element—whether Ms. Pena Pena was an alien—appeared to be conceded since the Defendant did not contest it. Second, the Government did not have to prove how Ms. Pena Pena entered. She was found in the bushes in Annaberg, a remote location, at 9:00 p.m. when it was pitch black. A person would not put themselves in that area if there was not some consciousness of guilt. She said she came by boat from Tortola and her passport stamp corroborated that fact. She also said her children lived on St. John. The evidence shows she knows St. John, given the Covid 19 card indicating she had been on St. John before. She did not enter at a designated port of entry, as Annaberg was not a port of entry, she did not have a stamp in her passport showing that she entered at the port of entry, and she did not have the requisite documents from the United States to enter the country. The Government requested that the motion be denied.

The Court denied the Rule 29 motion. It pointed to evidence showing that law enforcement received a tip about a possible illegal landing in the territory, Ms. Pena Pena

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 12

was found at Annaberg. Her passport showed that she was from the Dominican Republic, and that she had left the Dominican Republic and went to Tortola earlier on the same day she was found on St. John. She then asked to be sent back to the Dominican Republic. The Government had offered sufficient evidence to support finding her guilty of the § 1325 offense.

The defense rested, calling no witnesses and offering no exhibits. It renewed its Rule 29 motion; the Government reiterated its opposition; and the Court denied the motion for the same reasons as previously articulated.

### III.    Closing Statements

In closing, the Government adopted its Rule 29 arguments.

Attorney Campbell reiterated and added to his Rule 29 arguments in his closing. He disputed alienage based on Ex. 10, the U.S. Citizenship & Immigration Services "Certificate of Nonexistence."[3] He argued that document did not establish that a thorough search of all records was done to establish that Ms. Pena Pena obtained consent to enter the United States as it only checked two systems. The only testimony about systems checks at trial came

---

[3] This was a certification dated May 12, 2025 by Ms. Lorelie Conner, the USCIS Field Office Director, that averred that Ms. Conner was authorized to "certify the nonexistence of an official service record." Ex. 10. USCIS maintains centralized records relating to immigrant aliens who have entered the United States after June 1924; nonimmigrant aliens who have entered after June 1948; and all persons naturalized after September 1906. Ms. Conner performed a search for records related Ms. Pena Pena on the Person Centric Query Service and the Person Centric Identity Service. After a diligent search, no record was found indicating that Ms. Pena Pena obtained consent at any time from the Attorney General of the United States or after April 6, 2001 or from the Secretary of the Department of Homeland Security for re-admission in the United States in accordance with statute. *Id.*

through Agent Williams, but none of that information was contained in his report. Thus, at the time of the event, the question of whether the person was an alien did not make it into the report to justify the prosecution. That information came out for the first time at trial. The Court should consider the question of whether there was a thorough records check, as well as the sloppy, if not untrue testimony regarding the personal history report. Assumptions were made and corners were cut because the interpreter did not go over the entire form with Ms. Pena Pena. The testimony at trial did not match what Agent Williams put down on paper, which is why the Government did not prove beyond a reasonable doubt that Ms. Pena Pena was guilty of the offense.

As to the "knowingly entered the United States" element of the offense, a lack of direct evidence showed when, where, with whom she entered St. John. Agent Hayes testified she came by boat, but it is not known what she knew, thought, or felt when she entered. There was testimony that Annaberg is known for alien smuggling, which is a profitable and dangerous business, but it is not known if the man who escaped that evening had a weapon, was a smuggler, or whether Ms. Pena Pena was a willing or unwilling participant, having been smuggled to St. John. The testimony was equally consistent that she was. The fact she had family on St. John does not mean she was not smuggled. A smuggling victim should not be treated as a criminal. As to her statement "Just send me back," it could mean that she knew she was caught and did not want to go to jail, or that she wanted to be sent back because she was terrified and victimized. While she came on a boat, the Government did not establish that was her choice. The Government has not proved the requisite intent.

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 14

Attorney Baker responded to a number of the issues raised. As to the first element of the offense, Ms. Pena Pena had a passport from the Dominican Republic, identification from the Dominican Republic, stated to Agents Napper and Hayes that she was from the Dominican Republic, and reiterated that statement in her interview with Agent Williams. She also stated that her parents and children were from the Dominican Republic. The only mention of the United States was the address she gave on St. John and her COVID card. Agent Williams asked her questions regarding her personal history and what he wrote on the form was verified by the translator. The representation that Ms. Pena Pena was a victim or afraid has no support in the record. Rather the evidence supported each element of the offense.

The Court took the matter under advisement.

## DISCUSSION

### I.　The Offense of Illegal Entry

Title 8, Section 1325(a)(1) provides:

> Any alien who enters or attempts to enter the United States at any time or place other than as designated by immigration officers . . . shall, for the first commission of any such offense, be fined under title 18 or imprisoned not more than 6 months, or both[.]

8 U.S.C. § 1325(a)(1). The Immigration and Nationality Act ("INA"), of which 8 U.S.C. § 1325 is a provision, defines "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). "Immigration officer" is defined as "any employee or class of employees of the Service[4] or of the United States designated by the [Secretary of Homeland Security],

---

[4] The INA was signed into law before DHS existed, when the Immigration and Naturalization

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 15

individually or by regulation, to perform the functions of an immigration officer." 8 U.S.C. § 1101(a)(18).

In *United States v. Sajous*, No. 3:25-cr-00036, 2025 WL 2097261 (D.V.I. July 25, 2025), this Court confronted the fact that § 1325(a) was silent as to any *mens rea* requirement. The Court concluded that it was not a strict liability offense but that the presumptive intent that attached to criminal charges, "knowing," applied to § 1325(a). *Id.* at *8. The Court held that the Government must prove that the defendant (1) is an alien; (2) who knowingly entered the United States at any time or place other than as designated by immigration officers.

According to the Third Circuit's Model Jury Instructions (Criminal), a person acts knowingly if he

> acts voluntarily and intentionally and not because of mistake or accident or other innocent reason. This means that the government must prove beyond a reasonable doubt that the Defendant was conscious and aware of the nature of her actions and of the surrounding facts and circumstances, as specified in the definition of the offense charged. When considering whether a defendant acted "knowingly," the factfinder "may consider evidence about what the Defendant said, what the Defendant did and failed to do, how the Defendant acted, and all the other facts and circumstances shown by the evidence that may prove what was in [the Defendant's] mind at that time.

Third Cir. Model Crim. Jury Instr., § 5.02, https://www.ca3.uscourts.gov/model-criminal-jury-table-contents-and-instructions, last visited 2/27/2026 (citation modified); *see also United States v. Dixon*, 548 U.S. 1, 5 (2006) ("As we have explained, unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge

---

Service, an agency in the Department of Justice, oversaw most immigration-related issues. Parts of the statute still refer to the Immigration and Naturalization Service, or "the Service."

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 16

of the facts that constitute the offense.") (citation modified). Knowledge can be inferred by circumstantial evidence. *United States v. Curran*, 2025 WL 1577564, at *2 (3d Cir. June 4, 2025).

## II. Application

### A. Whether Ms. Pena Pena is an Alien

The first element of a § 1325(a)(1) violation that the Government must prove beyond a reasonable doubt is whether Ms. Pena Pena is an alien. As indicated above, the INA defines an alien as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). The evidence concerning this factor comes from multiple sources and is undisputed. Ms. Pena Pena presented a passport from the Dominican Republic to Agent Hayes, and Agent Williams also examined it. It was entered into evidence as Gov't Ex. 4 and showed that Ms. Pena Pena was a citizen of the Dominican Republic. Her Cedula card identified her nationality as Dominican Republic. When she was asked by Agents Napper and Hayes if she was Dominican, she answered in the affirmative, and she repeated that information during the interview with Agent Williams when he asked her citizenship as background information for the personal history report, Ex. 8. This information was confirmed by the translator, and her response was captured on the video that memorialized the interview. She asked to be sent back to the Dominican Republic. All of the evidence elicited at the bench trial supports the conclusion that Ms. Pena Pena was a citizen of the Dominican Republic, and not the United States, and therefore an "alien" under the definition of 8 U.S.C. § 1101(a)(3).

Defense counsel's hypotheticals about whether a person could be a dual citizen—

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 17

having passports from both the Dominican Republic and the United States—was merely argument, as no evidence whatsoever was elicited showing that Ms. Pena Pena had United States citizenship, much less a United States passport.

Accordingly, the Government has proven beyond a reasonable doubt that Ms. Pena Pena is an alien, thereby satisfying the first element of § 1325(a)(1).

### B. Whether Ms. Pena Pena Knowingly Entered the United States at Any Time or Place Other Than as Designated by Immigration Officers

Ms. Pena Pena did not testify at trial, and therefore the Court has no direct evidence of her state of mind when she entered the United States. The Court therefore relies on circumstantial evidence in assessing whether she "knowingly enter[ed ]" the United States at any time or place other than as designated by immigration officers. 8 U.S.C. § 1325(a)(1).

The evidence showed that CBP received a tip regarding a possible "migrant landing" on Annaberg on the evening of May 8, 2025. According to Agents Martin and Hayes, Annaberg was known to be a hot spot for smuggling and migrant entry because it was located on the north shore of St. John, a mere ten-minute boat ride from Tortola. Agents Martin and Napper apprehended Ms. Pena Pena who was hiding in the bushes. She admitted to Agents Napper and Hayes that she was Dominican and stated that she had arrived by boat. Her passport confirmed her Dominican citizenship and her Cedula confirmed Dominican nationality. As Agent Williams testified, the exit stamp in her passport showed that she left the Dominican Republic earlier that day—May 8, 2025—bound for Tortola. Thus, the circumstantial evidence strongly points to Ms. Pena Pena's entry into the United States on the evening of May 8, 2025, having traveled from the Dominican Republic to Tortola and finally to St. John.

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 18

Moreover, the manner of her entry strongly supports an inference that she knowingly entered the United States at a time and place other than designated by Immigration Officers. The Annaberg area was isolated, very dark, and known not to have law enforcement presence. That would be a choice location to enter the United States if a person deliberately wanted to avoid encountering immigration officers and make a furtive entry. She admittedly came on a boat that was nowhere to be found—in other words, the boat dropped her (and likely the other two individuals that the Agents encountered that evening) and left. The only port of entry on St. John was Cruz Bay, which was quite a distance from Annaberg, and was not open at 9:00 p.m.—showing that Ms. Pena Pena did not intend to have her entry proceed through normal channels by immigration agents at a United States port of entry.

Further, the evidence showed that Ms. Pena Pena had been in the United States at least twice before: in 2015, when she asked for voluntary departure from the Cyril King Airport on St. Thomas, and in 2022 when she received COVID vaccine shots on St. John. Her 2015 voluntary departure indicated that she did not have proper immigration status to be in the United States at that time—a point that was underscored by the fact that the immigration systems checks showed no record of a lawful entry into the United States or *any* entry at the United States border. *See United States v. Patel*, No. 3:25-cr-0070, 2025 WL 3641863, at *4 (D.V.I. Dec. 16, 2025) (noting that all Department of Homeland Security databases searched by CBP agents contained no record of the defendant's entry at a designated port of entry and inspection by CBP officers, and that the absence of such records indicated that defendant's entry into the United States was illegal). The systems checks conducted by Agent Williams

also indicated that Ms. Pena Pena did not have a valid visa to be in the United States or any other legal status authorizing her presence in the country, which explains why she chose to enter surreptitiously.

It is reasonable to infer from this evidence that Ms. Pena Pena understood on May 8, 2025 that she could not cross an international border without presenting herself to immigration authorities and providing required documentation for entry. The fact that she did not do so supports the reasonable inference that she was seeking to avoid an encounter with those immigration authorities.[5] Further, her previous presence in the United States without any history of presenting herself to immigration authorities and without any border crossing history supports the inference that she successfully avoided immigration authorities in the past in order to be present in the country—and that when she did come to the authorities attention in 2015, she requested voluntary departure that avoided administrative or criminal proceedings. As a result, the Court finds that the record contains sufficient and ample circumstantial evidence that Ms. Pena Pena acted voluntarily and intentionally, and not because of mistake or accident or other innocent reason, when she entered St. John on May 8, 2025 at a time and place other than as designated by immigration officials. As a result, the Court concludes that the Government proved this second element of illegal entry, 8 U.S.C. § 1325(a)(1), beyond a reasonable doubt.

---

[5] As the Court observed in *Sajous*, 2025 WL 2097261, at *8 n.15, "an alien who entered the United States and then avoided all contact with immigration officials cannot claim that they did not know they needed to enter the country at a place designated as proper by immigration officers."

*United States v. Pena Pena*
3:25-cr-00050-RAM-EAH
Memorandum Opinion
Page 20

The Court rejects as argument unsupported by any evidence Defendant's position that Ms. Pena Pena may have been the victim of a smuggling ring, particularly as she has lived in St. John previously and her children are presently there. It also rejects Defendant's arguments that Agent Williams's testimony was not truthful and "sloppy."

## CONCLUSION

For the reasons set forth above, the Court hereby **FINDS** Ms. Pena Pena **GUILTY** of Count One of the Information, entering the United States at a time and place other than as designated by an immigration officer, in violation of 8 U.S.C. § 1325(a)(1).

ENTER:

Dated: March 2, 2026

/s/ Emile A. Henderson III
EMILE A. HENDERSON III
U.S. MAGISTRATE JUDGE